IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MADISON AREA MECHANICAL AND SHEET METAL CONTRACTORS ASSOCIATION, INC., GENERAL HEATING AND AIR CONDITIONING, INC. and ILLINGWORTH-KILGUST CORPORATION,

Plaintiff,

v.

OPINION AND ORDER

10-cv-00363-wmc

LOCAL NO. 601 OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY,

Defendant.

---

On June 30, 2010, plaintiffs Madison Area Mechanical and Sheet Metal Contractors Association, Inc., General Heating and Air Conditioning, Inc., and Illingworth-Kilgust Corporation (collectively "the Association") filed a complaint and a motion for *ex parte* restraining order and for preliminary injunction to enjoin striking activities of defendant Local No. 601 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry ("Local 601"). The Association argues that Local 601 is contractually bound to enter into interest arbitration and to refrain from striking pending its final resolution. After full briefing by both sides and oral argument today on the motion for TRO, the court denies the Association's motion because (1) the 2007-2010 collective bargaining agreement ("CBA") does not on its face contain an interest arbitration provision and (2) the Association has not met its burden

of establishing a likelihood of success on its claim that a 2002 order by an industrial relations council to add a sample, interest arbitration clause to Addendum B of the parties' 2002-2004 CBA somehow survives and is enforceable in later CBAs given the parties' failure to ever reduce this clause to writing, much less invoke it until after termination of the 2007-2010 CBA.

## FACTS

Based on the submissions of the parties, the court makes the following factual findings for purposes of deciding the pending TRO motion.

### A. Background

Local 601 is the exclusive collective bargaining representative for steamfitters working for contractors represented by the Association on work performed in a defined geographic area including much of Southeast Wisconsin. Local 601 and the Association, the contractors the Association represents, and four Madison-area independent contractors (two of which are named plaintiffs) are parties to a series of multi-employer collective bargaining agreements. The most recent collective bargaining agreement covered the period from June 1, 2007 to May 31, 2010 ("2007-2010 CBA"). (Compl. (dkt. #1), Ex. 2.)

### B. Industrial Relations Council

In 2002 and 2004, the parties submitted to interest arbitration with the Industrial Relations Council for the Plumbing and Pipe Fitting Industry ("IRC") in negotiating the terms of a successor CBA. In 2002, the parties agreed:

> [T]hat if the undersigned parties, the [Association] and Steamfitters Local #601, do not reach an agreement in Madison Steamfitters contract negotiations by May 4, 2002, that both parties will agree to binding arbitration by the [IRC]. Both sides specifically agree to submit the wage and term items to the IRC.

(Affidavit of Kevin LaMere ("LaMere Aff.") (dkt. #25), Ex. 3; *see also id.*, Ex. 2.)

In a decision dated June 13, 2002, the IRC made determinations concerning wages and other benefits. (Declaration of Marcie M. Marquardt ("Marquardt Decl.") (dkt. #8), Ex. 2.) This decision also contained the following provision:

> 12. New Section: **INDUSTRIAL RELATIONS COUNCIL CLAUSE** Industrial Relations Council Clause for negotiation shall be added to Addendum B.

(*Id.* at 4.)

The Union denies ever agreeing to paragraph 12, though it did not appeal the IRC's order and a sample negotiation clause referenced in the IRC's 2002 decision is available in IRC publications and on its website. This sample clause provides:

> If local facilities to resolve one or more items in contract negotiations over wages, hours or working conditions have failed of settlement, both parties agree to submit the unresolved issues to the Industrial Relations Council for the Plumbing and Pipe Fitting Industry for further negotiation as their representatives, and further agree that all terms and conditions of this agreement shall continue in full force and effect, pending final decision by the Industrial Relations Council.

(Marquardt Decl., Ex. 3 at 14; *see id.*, Ex. 4 at 3.) Ultimately, the parties did not formally sign a CBA covering the 2002-2004 period, and therefore the negotiation provision referenced in paragraph 12 of the June 13, 2002 IRC decision was never reduced to writing. (*See* LaMere Aff. ¶ 10, Ex. 1.)

While negotiating the 2004-2007 CBA, the Association requested the addition of a standard IRC Negotiation Clause as follows: "In addition a new section must be inserted into the document for the Industrial Relations Clause, per the decision of the Industrial Relations Council rendered on June 12, 2002." (LaMere Aff., Ex. 6.) The Union did not consent to this request and the language was again not added.

While the negotiations for the 2004-2007 CBA were referred to IRC arbitration, Local 601 contends that its decision to participate in 2004 was again wholly voluntary. (LaMere Aff. ¶ 13.) The Association, on the other hand, contends that the 2004 IRC Arbitration was mandated by the 2002 IRC decision ordering the adoption of interest-based arbitration. (Second Declaration of Marcie M. Marquardt ("2nd Marquardt Decl.") (dkt. #31) ¶ 9.) Apparently neither party raised the issue of interest-based arbitration before the IRC in 2004 and its order made no mention of the survivability or absence of a standard negotiation clause in either the 2002-2004 or 2004-2007 CBAs, nor did the parties add this provision in the 2007-2010 CBA.

### C. Key Provisions of 2007-2010 CBA

The 2007-2010 CBA does contain the following provisions, which are potentially relevant to deciding the present motion:

**Part B, Addendum B, Article XVIII (Contract Administration Provisions)**

> Section 18.1. No Work Stoppage. No strikes or lockouts or stoppages of work shall take place as a result of any alleged violations of the terms of the Agreement and/or this Addendum, and any such cases shall be referred immediately to the Union and the Madison Association for resolution.
>
> Section 18.2. Joint Adjustment Board. There shall be a Steamfitting Industry Joint Adjustment Board made up of two persons representing the Union and two persons representing the Madison Area Association. The Board shall meet regularly at such stated times as it may decide, however it shall also meet within four days when notice is given by either party in writing.
>
> . . .
>
> (d) Should the Steamfitting Industry Joint Adjustment Board fail to agree to adjust any matter, such matter shall then be referred to the Industrial Relations Council (IRC) for the Plumbing and Pipefitting Industry. The decision of the IRC shall be final and binding on all parties hereto.
>
> (e) When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matter arose, shall not be changed or abrogated until the decision is rendered.

(*Id.* at 59-60.)

**D. Recent Events Leading Up to Targeted Strikes**

The parties began negotiating a successor CBA on May 18, 2010.[1] The negotiations were unsuccessful, with the final negotiation occurring on June 17, 2010.

[1] The parties agree that Local 601 sent timely notice to the Association cancelling the 2007-2010 CBA effective May 31, 2010, though they further agree that cancellation of the 2007-2010 CBA has no bearing on the present motion because if an interest arbitration provision exists, it survives such cancellation.

Following the collapse of the negotiations, Local 601 sent a letter to contractors represented by the Association dated June 21, 2010, alerting the contractors that: "In the near future your company may or may not be subjected to a job action." (Declaration of David Orr ("Orr Decl.") (dkt. #6) ¶ 5 & attached exhibit.)

Beginning on June 22, 2010, Local 601 ordered some of its members to engage in strikes involving three contractors. (LaMere Aff. ¶¶ 21-25.) The strikes appear targeted at member contractors who are on the negotiations committee.

- Ten union employees of defendant Illingworth-Kilgust walked off of their jobs on June 22, 2010 and as of June 29, 2010 had not returned to work. (Declaration of David Bultman ("Bultman Decl.") (dkt. #5) ¶ 8.) These striking workers were working on jobs at the Chazen Museum of Art, US Bank, and ACS INC. (*Id.* at ¶ 9.)

- On June 23, 2010, 17 union workers employed with defendant General Heating and Air Conditioning, Inc. failed to report to work at the University of Wisconsin, Wisconsin Institute for Discovery project. (Orr Decl. ¶ 8.) On June 30, 2010, an additional 21 workers failed to report to work, including all of the steamfitters assigned to General Heating and Air Conditioning, Inc.'s projects at UW Hospital, Meriter Hospital, the VA Hospital, and MATC. (Second Declaration of David Orr ("Second Orr Decl.") (dkt. #15) ¶ 3.)

- On June 30, 2010, 20 steamfitters did not report to work for Hooper Corporation at projects at Scientific Protein Labs, Sigma Aldridge Fine Chemicals, the VA Hospital, and Capital Heat & Power Plant. (Declaration of Steve Millmann ("Millmann Decl.") (dkt. #14) ¶ 3.)

## OPINION

### I. This Court's Authority to Enjoin Strikes

The Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, broadly prohibits federal courts from issuing injunctions in labor disputes.

> No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101; *see also* 29 U.S.C. § 104 (specifically delineating "[c]easing or refusing to perform any work or to remain in any relation of employment" as an act not subject to an injunction).

In *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), the Supreme Court recognized an exception under the Norris-LaGuardia Act allowing for the issuance of an injunction where it was undisputed that the CBA provided: (1) "all controversies concerning its interpretation or application should be resolved by adjustment and arbitration procedures set forth" in the CBA, and (2) "during the life of the contract, there should be 'no cessation or stoppage of work, lock-out, picketing or boycotts'." 398 U.S. at 238-39 & 239 n.4; *see also id.* at 254 ("there is no dispute that the grievance in question was subject to adjustment and arbitration under the collective-bargaining agreement").

The parties agree that the outcome of the present motion for TRO depends on whether the 2007-2010 CBA contains an interest arbitration clause. The Association contends that it need only demonstrate a "better than negligible" likelihood of prevailing on the issue. (Pls.' Br. (dkt. #3) at 3 (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)). While this may be so in the ordinary case (assuming the other factors justifying the entry of injunctive relief are sufficiently

shown),[2] "the rules are somewhat different [in labor cases], because of additional statutory restrictions against the issuance of injunctions." *Chicago Dist. Council of Carpenters Pension Fund v. K & I Constr., Inc.* ("*K & I Constr.*"), 270 F.3d 1060, 1064 (7th Cir. 2001). For this reason, a party "seeking to enjoin a labor action is subject to an extra burden: it must both satisfy the normal requirements for an injunction and also demonstrate that the contract language binds the union to arbitrate the dispute that precipitated the strike." *Id.* This is a burden the Association has not met.

In addition to *Boys Markets,* the Association primarily relies on *Mechanical Contractors Association of Madison, Inc v. Steamfitters Local Union No. 394*, No. 75-C-25, 1975 WL 1130 (W.D. Wis. June 11, 1975), in support of their motion for a TRO, claiming that this "previous decision involving similar facts (and even the same parties)" should govern the outcome of this case. (Pls.' Br. (dkt. #3) at 2.) In *Mechanical Contractors*, the court granted the plaintiff's motion for a preliminary injunction under the

---

[2] In addition, a district court must also consider "whether issuance of an injunction would be warranted under ordinary principles of equity." Specifically, the court must assess:

> whether breaches are occurring and will continue or have been threatened and will be committed; whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance.

*Boys Markets*, 398 U.S. at 253-54 (quotation marks and internal citation omitted). Because the Association fails to meet its burden under the contract, the court need not consider the equitable factors. *See K & I Constr.*, 270 F.3d at 1064, 1070 (affirming district court's denial of preliminary injunction against a strike because the employer did not demonstrate that the CBA requires arbitration of the dispute at issue, without considering balance of harms).

*Boys Markets* exception. The *Mechanical Contractors* court relied on the language of Section 12.3 of the then applicable CBA, which provided:

> If, during negotiations, the parties do not reach a mutually satisfactory agreement by the termination date of the contract, all unresolved issues shall be submitted to the Industrial Relations Council for the Plumbing and Pipefitting Industry. It is agreed and understood that there should be no suspension of work by strike, lockout or any other means pending the decision of the Industrial Relations Council and the decision of the Industrial Relations Council shall be final and binding on the parties.

1975 WL 1130, at *1 (emphasis added). Section 12.3 also provided that:

> the foregoing procedure for settlement of issues which are not resolved in negotiations prior to the contract termination date shall survive this agreement and be incorporated in the next contract between the parties, and shall in no way be subject of proposals [ma]de during negotiations nor shall any change therein be a condition of settlement.

*Id.* at *2 (emphasis added).

In enjoining the striking activities, the *Mechanical Contractors* court found that this provision "binds the defendant to submit to the Industrial Relations Council (IRC), the question of whether changes should be made in Section 12.3, and binds the defendant and the employees it represents to refrain from any suspension of work by strike or other means, pending the decision of the IRC." *Id.* at *2.

## II. Lack of Binding Interest Arbitration Provision

Unlike *Boys Market* and *Mechanical Contractors*, an express requirement for interest-based arbitration is missing here. The Association points to two possible sources outside the express terms of the CBA for imposing binding interest arbitration -- the IRC

Negotiation Clause and Article XVIII of the 2007-2010 CBA. But neither overcomes the heavy burden the Association bears in asking the court to look beyond the terms of the parties' contract; nor does the fact that the parties were at least arguably bound to an interest-based arbitration clause at the end of their 2002-2004 CBA relieve this court of its obligation to determine the existence of such a clause in the current CBA.

**A. Implication of 2002 IRC Decision**

The Association primarily relies on a sample IRC Negotiation Clause (*see supra* p.3) found in IRC publications and on the IRC website as a source of binding interest arbitration to permit the court's entry of a *Boys Markets* injunction.[3]

As an initial matter, the parties disagree as to whether the 2002 IRC requirement that the IRC Negotiation Clause be added to the CBA was valid when ordered. Local 601 maintains that the IRC overstepped its authority in requiring the provision be added to its CBA. In 2002, the parties agreed to "submit the wage and term items to the IRC." (LaMere Aff., Ex. 3.) Local 610 contends that paragraph 12 of the IRC's 2002 decision falls outside of the agreed upon categories subject to arbitration. "[A]rbitrators derive their authority to resolve disputes only because the parties agreed in advance to submit

---

[3] Even if the court were to find the IRC Negotiation Clause binding here, the categories of arbitration under the clause are limited to "wages, hours or working conditions". (Marquardt Decl., Ex. 3 at 11) Thus, the dispute underlying Local 601's decision to strike over portions of Addendum B not falling into these traditional labor subjects – *e.g.*, whether to include IRC arbitration in the new CBA -- may not constitute a dispute subject to arbitration. *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 407 (1976) (holding that where the dispute underlying a strike was not "even remotely subject to the arbitration provisions of the contract" an injunction would be improper).

such grievances to arbitration." *A T & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)"); *see also Sheet Metal Workers Local Union No. 20 v. Baylor Heating & Air Conditioning*, 877 F.2d 547, 555-56 (7th Cir. 1989) ("While the Arbitrator had authority to resolve this dispute and enter an award, the Arbitrator did not . . . have authority to include an interest arbitration clause in the new contract."), *abrogated on other grounds*, *Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427 (7th Cir. 1998).

The Association, on the other hand, contends that the IRC's incorporation of an interest-based arbitration provision is part of its standard practice recognized under the NLRA. (Second Declaration of Scott Strawbridge ("2nd Strawbridge Decl.") (dkt. #28) ¶ 2.) More persuasively, the Association contends that Local 601's failure to take any action to appeal, vacate or repudiate the IRC's 2002 decision makes it binding on the parties, who proceeded under the terms of the unsigned 2002-2004 CBA. (Pls.' Reply (dkt. #27) at 5, 8.)

The court need not resolve this issue for purposes of deciding the TRO motion. Whether or not the IRC's general order to add an IRC "Clause for negotiation" to Addendum B was sufficient to bind the parties to the unsigned 2002-2004 CBA, the court finds unpersuasive any argument that this dubious beginning supports an unstated continuation of interest arbitration clauses in all later CBAs.

Instead, this case turns on the fact that the IRC Negotiation Clause is not in the 2007-2010 CBA, nor is it in the predecessor CBA for 2004-2007. Indeed, while the IRC directed the parties to add the negotiation clause to the 2002-2004 CBA (*see* Marquardt Decl., Ex. 2 ¶ 12), it was not. Even after the Association explicitly requested that the

negotiation provision be added during the negotiation process for the 2004-2007 CBA, it was not. (*See* LaMere Aff., Ex. 6). On this record, the court is unable to find an unstated interest arbitration survives to control the Union's right to strike post the term of the 2007-2010 CBA.

**B. Article XVIII of the 2007-2010 CBA**[4]

Article XVIII, Contract Administration Provisions, is limited by its terms to rights or grievance arbitration, not interest arbitration. Section 18.1, quoted above, prohibits strikes as a result of "any alleged violations" of the CBA, and Section 18.3 defines the procedure for resolving "grievances or questions in dispute," including IRC arbitration. Interest arbitration "is used to establish the new terms and conditions of employment under a collective bargaining agreement." Thomas E. Carbonneau, *The Law and Practice of Arbitration* 89 (3d ed. 2009).

On the other hand, "rights or grievance arbitration involves the interpretation or application of the terms and conditions of employment contained in the collective bargaining agreement." *Id.* A rights or grievance arbitration provision cannot mandate interest arbitration or vice versa. *See Graphic Commc'ns Union v. Chicago Tribune Co.*, 794 F.2d 1222, 1223-24 (7th Cir. 1986) (treating separately three arbitration provisions -- two concerning rights or grievance arbitration and one concerning interest arbitration).

---

[4] The Association conceded at the hearing today that Article XVIII did not provide for interest arbitration, but nevertheless, for completeness sake, the court will address the argument raised in the Association's opening brief that Article XVIII, namely Sections 18.1 and 18.3, require interest arbitration.

The language of Article XVIII speaks only to rights or grievance arbitration and not to interest arbitration, but perhaps the best evidence that Article XVIII is limited to grievance or rights arbitration is demonstrated by the parties' historical actions. As described by Local 601, "[w]hen the parties wanted to participate in interest arbitration in 2002, rather than citing to Article 18 of either the general agreement or Addendum B, they instead negotiated a separate side agreement committing themselves to participate in interest arbitration over the narrow issues of wages and terms of the contract." (Def.'s Opp'n Br. (dkt. #24) at 13 (citing LaMere Aff., Exs. 2-3).) If Article XVIII -- which has contained the same language since at least as the CBAs for the period 1999 (*compare* LaMere Aff., Ex. 1 at 5 *with* Compl., Ex. 2 at 62-63) -- requires mandatory interest arbitration, then there would have been no need to enter a separate agreement for the 2002 IRC arbitration proceeding or to agree voluntarily to 2004 IRC arbitration.

Section 12.3 in the 1975 *Mechanical Contractors* decision discussed above and relied on by the Association stands in stark contrast to the hodgepodge of CBA provisions and references to IRC publications that the Association points to in this action. The Association has failed to point to a current and binding mandatory interest arbitration provision.

### C. Jurisdiction of Court to Decide "Survivability" of IRC Negotiation Clause

Finally, the Association contends that the court lacks jurisdiction to decide whether the IRC Negotiation Clause is a binding part of the 2007-2010 CBA because this would require the court to decide the merits of the dispute: whether Local 601 has

repudiated the IRC Negotiation Clause. (*See* Pls.' Reply (dkt #27) at 4.) In support, the Association cites *United Steelworkers of America v. Warrior & Gulf Navigation Company*, 363 U.S. 574 (1960), in which the Supreme Court reversed the district court's denial of a motion to compel grievance arbitration.

Even if *United Steelworkers* could be read as applying outside of the grievance or rights arbitration context (which is a questionable presumption), this opinion does not permit the court to punt the issue of survivability of any interest arbitration clause to the IRC. To the contrary, the Supreme Court in *United Steelworkers* held that "the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." 363 U.S. at 582.

A determination of whether a binding interest arbitration provision is currently in place necessarily requires the court to decide whether the IRC Negotiation Clause survives in the 2007-2010 CBA. *See Mulvaney Mech. v. Sheet Metal Workers Int'l Assoc., Local 36*, 351 F.3d 43, 46 (2d Cir. 2003) (noting that "questions of arbitrability," namely, "whether the parties are bound by a given arbitration clause" should be resolved by the courts) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002)); *K & I Constr., Inc.*, 270 F.3d at 1066 ("[A]s a rule, whether a labor-management dispute is a mandatory subject of arbitration is a question for the courts.")). Because the court finds that the IRC Negotiation Clause does not survive in the 2007-2010 CBA -- an issue which is within the court's jurisdiction -- it need not reach the issue of any earlier, claimed repudiation.

The Association's argument that a presumption of arbitrability should apply in this case is also rejected. (Pls.' Reply at 4.) As the Seventh Circuit explained in *K & I Construction*, this presumption is limited to instances of ambiguous contractual language:

> No court would need to resort to the arbitrability presumption unless it found the contractual language genuinely ambiguous-ambiguous in the same sense that would entitle the parties to present external evidence to shed light on the parties' true intensions. . . . An employer's initial burden under *Boys Markets* is thus just the same as the initial burden faced by any party who wishes to convince a court that the plain language of a contract cannot stand on its own: it must show that the language of the arbitration clause is susceptible to more than one reasonable interpretation, including an interpretation under which it covers the dispute that gave rise to the labor action.

270 F.3d at 1067-68. Here, there is no ambiguous contractual language. Indeed, there is no interest arbitration language at all, except by implication in an earlier, unsigned CBA. That is simply not enough to meet the Association's burden.

ORDER

IT IS ORDERED that the motion for *ex parte* restraining order and for preliminary injunction filed by plaintiff Association (dkt. #2) is DENIED, and that the court will hold a telephonic status conference at 10:00 a.m. tomorrow to discuss the remaining motion for preliminary injunction.

Entered this 8th day of July, 2010.

BY THE COURT:
/s/

WILLIAM M. CONLEY
District Judge